My name is Janine Jansen. I am here on behalf of the appellant, Dahmes Stainless. This is a private breach of contract action. The appellant and the appellee, the appellee here is Rembrandt Enterprises. Contracted in November of 2014 for Dahmes Stainless, my client, to build an industrial dryer for egg products. Rembrandt is a producer of egg products and Dahmes Stainless is a manufacturer of a lot of egg drying machines. And these are not your typical Maytag. I'm sort of giving my brand preferences a little nod there, I suppose. But yeah, these things are three, four, or five stories tall. They are very big pieces of machinery. And the amount of this, the amount that Dahmes was to be paid for this performance, which would have been designing, manufacturing, and installing this dryer in a new facility that Rembrandt, or in a part of a facility that Rembrandt would have expanded for this purpose, the total amount of that contract was on the order of 8.5 million. So it's not a small piece of machinery. After the parties entered into that contract in November of 2014, time was of the essence in the contract. That is in our, the contract is in our appendices and it does include a provision that time was of the essence. It was clear, the reason that time was of the essence, it turned out, was that Rembrandt was eager to set up a new commercial relationship with Kellogg's whereby it would provide dried egg products. That was unknown to Rembrandt, or I'm sorry, to Dahmes Stainless at the time. So they enter into the agreement in November 2014 and the plan was for Dahmes to have this dryer up and running and producing dried egg product that would be then tested, unbeknownst to Dahmes, but tested by Kellogg's in order to see whether Kellogg's would enter into a supply agreement with Rembrandt in January of 2016. So it's a really tight timetable. And the number of person hours that were dedicated to this project or estimated for this project was on the order of 37,000. But you'd only done a sixth of them or a low percent like that at the time of the breach, right? That's correct, yes. Okay. But so 37,000 person hours. What we're looking at there, of course, is 925 person hours and then you divide that by 52 per year, you're actually looking at 18 people who are going to be dedicated full-time to designing, manufacturing, sort of tweaking, doing whatever they have to do to make this product work. So what happened was that in 2015, so not that long after Rembrandt entered into the contract, Rembrandt started to have some second thoughts about the expense that it was going to incur on this project. And that's very clear from the records that it had. And ultimately in October of 2015, Rembrandt gave notice to Dames that it intended to cancel the contract, basically. And they kind of strung them along with, you know, we might want to renew this in the future, but basically we're not going to do this for now. To that point, they'd paid you a lot of money though, right? And they had paid a lot of money and that was per the contract. How much of it do they deserve back? Uh, what the position we had taken in the District Court was that if Rembrandt, or I'm sorry, if Dames had been paid its lost profits, which I think was required under the UCC, then Rembrandt would have been entitled to its restitution for amounts that were overpaid, if you will. And ultimately, that number, it kind of varies a little bit based on what you think the lost profits are. But it kicks around right about either cutting even or going up to Dames being entitled to like $700,000. So it varies a little bit and it depended on what the District Court would have concluded the lost profits were. But what happened, and I'm just going to focus on lost profits today. I will rely on the briefs for the restitution issues and whatnot. Because I think they're the lesser issue. The lost profits issue is governed by the UCC. There is absolutely no dispute about anything, any of the criteria for establishing a claim for lost profits other than whether Dames Stainless established its lost profits claim with reasonable certainty. And that's governed by the UCC in Minnesota. It's, you know, the section of the UCC that's in play is 708, per in two, and it's specifically the provision that would govern a bespoke product, as we would put it. One that was not just fungible. So it was something that, you know, had to be sort of designed based on the client's requirements. And what that provision says is that if the measure of damages in subsection 1, which has to do with fungible items, is inadequate to put the seller in as good a position as performance would have done, then the measure of damages is the profit, per in including reasonable overhead, which the seller would have made from full performance by the buyer. And then it goes on with other stuff. Dames' lost profits claim here was made under that provision. And ultimately, there was no dispute about causation. There was nothing else. So the sole issue was, did Dames reasonably prove with reasonable certainty, two things, basically, that it was likely to recover lost profit, that it likely had lost profits, and B, that the amount of those lost profits. But I will say that it's important that under Minnesota law, and I think this is endemic in Eighth Circuit cases and whatnot, uncertainty as to the fact of lost profits is deadly or fatal, but uncertainty as to the amount is not. And I think this case presents a situation where there was no uncertainty as to the fact of lost profits. There was no reasonable certainty. Well, let me ask you a question. The CFO, your CFO was designated as the corporate representative, right? Yes. And did your CFO said there'd be speculation as to the cost and speculation as a profit? He did. Is that enough to sustain the district court on lost profits? No, it should not be because... Tell me why. Because the CEO is an accountant who does not deal in, you know, he doesn't guess at anything ever in his life. But what actually was proven here, and this is where I go when I look at this, judge. I look at the other cases and admittedly, most of these cases usually come up to the court either on a situation where a fact finder has awarded lost profits or where lost profits have been precluded and the court, this court or the Minnesota Supreme Court, for example, has said, oh, no, no, no, there was enough here to consider lost profits. You need to reconsider. And so you don't often have the case where a fact finder has ruled them out, I would say here, as a matter of law. When I look at what the district court did here, I think the district court concluded that the only way that Dames could prove lost profits is if Dames could prove that its overhead costs in order to produce the product that was valued at that point, 8.9 million or whatever it was, were determinable and I liken it to, you know, me as a lawyer down to the 0.1, you know, the six minute increment. And if they weren't, then it was not reasonably certain. But in light of the 20-year history that this company has had, so Forrest Dames, the principal of this company... Let me cut the chase on the history. The other side claims that the three or four most comparable projects in the history show a loss. I think that they based that on the name, the label, DDD. And that label, the evidence I think showed here, that that label was something that was just applied to the product, basically just to brand it. And that otherwise, the most important issue is, were they egg dryers? And egg dryers was something that this company had been doing successfully with profits, profits ranging all the way up to 53% over a 20-year period. And not only was Forrest Dames, the principal of this company, capable of testifying, hey, I feel pretty comfortable that I'll get a 27% profit margin. He also had an employee who had been a competitor and who had bid for competitors and said, hey, we usually aim for a 27% profit margin, and we usually get that. So this is not a situation where we've got... Well, wait a minute. Isn't their claim really essentially that this Douglas dryer system was in fact a different technology, and that when that system was installed, that they had missed that 27% wildly, in fact, that they did in fact generate losses for each of those Douglas dryers? Is that a false statement? I think the way I would say it, Your Honor, is that the DDD dryer, Dames Douglas, because almost all of their dryers are Douglas. So the DDD dryers were just branded as such, and it was true that after Dames branded its dryers as such, it entered into a couple of contracts that included food products that were not normal for them. One was a contract for drying algae, which had not been done before, and Dames being Dames, stood by their promises to their customer and made it work, even though that meant they went in the hole. And then there was another project where Dames was asked, I think, to retrofit a previous dryer that was, I think, made... And I may mix this up. I may have flipped them in my mind. But I think it was made to dry chicken products, and they ultimately had to retrofit it to dry meat. And so what you're telling me is that there really was nothing new about this technology. What there was was a new name in order to honor the boss. Forrest Dames, yes. Who deserved to be honored. No, yeah, I'm not denying that. So what I want to point to is, I think that the, and I am aware of my time, I think that the big problem here, when I look at the district court's decision, I think it was unduly influenced by the Minnesota Court of Appeals' decision in a case called Poplar. And we do talk about this in our briefs at some length. And the thing I want to point out about that is that Poplar is a tort case. It is not a UCC case. It does not, it is not beholden, therefore, to the provisions of the UCC that say that the measure of damages is the profit including reasonable overhead. So what happens in Poplar is that you've got these dairy farmers who have a big electrical thing built on their property, and all of a sudden they start losing cows, and they start losing milk production. And then they are criticized saying, you didn't prove lost profits because you didn't show us how much less hay you had to feed the fewer cows that you had because some died, and you didn't prove how much fuel you would have incurred, or how much less fuel you incurred because you had to transport less milk. But there are two things, I would like to just jump on this and then I'll drop out. Your Honor, Judge Beam, in preparing for this, I certainly always look at the cases that the judges have decided. And I look at the Marvin Lumber case where the plaintiff told the jury to go into his tummy to find a damage amount, and that is not this case. And I see that I'm running out of time. May I finish? Unsentence. Okay. And then I notice, Judge Benton, that in the Hines case, which applies, these both apply Minnesota law, where the court rejected a lost profits case because the plaintiff failed to prove causation regarding any reduction in his sales, and it was a new business, et cetera. So, like, overall, I am hard-pressed to think of a case where the evidence was as strong as it was here where no lost profits were awarded. Thank you. Thank you, Counsel. Mr. Beaudry. Thank you, Your Honor. May it please the court, Alon Beaudry, for appellee Rembrandt Enterprises. Dames' appeal should be denied because it raises no issue of law and because Judge Strand's careful, detailed findings that Dames' lost profits are speculative is supported by overwhelming evidence in the record. What level of evidence do you think it is? You said overwhelming. What level do you think it has to be supported by? Substantial. Proceed. And in this case, as to the alleged legal error, Dames first claims that Judge Strand applied the wrong legal standard by requiring mathematical certainty. His original decision specifically acknowledges that all that's required is reasonable certainty, not mathematical certainty. Nonetheless, they brought a motion for a new trial and he examined their claim that he had required mathematical certainty and he rejected it and he said, no, that is not the standard. The standard is reasonable certainty and you didn't meet that. So he did indisputably apply the correct standard. In terms of the district court's findings that there was little or no reason to believe that Dames would actually have earned a profit if the project would have proceeded to completion, there's voluminous evidence in the record corroborating its findings. Judge Benton, you referenced the testimony by Mr. DeGeest, the CFO of the company, that he admitted it would require speculation. And the explanation you were given is, well, he's just the accountant and he's very cautious. That testimony, Your Honor, was given as a 30B6 representative binding on Dames. And what happened at trial is Mr. DeGeest tried to change his testimony quite substantially. And what he says, well, even though I said I would require speculation, what I really meant is I couldn't determine it to the actual penny and I can determine costs to a reasonable certainty. So he attempted to directly contradict the sworn testimony that had been provided at the 30B6 deposition, and Judge Strand made a credibility finding and did not credit the attempt to change the testimony. And, in fact, he just said, I'm relying on the sworn testimony. And he's entitled to do that. Did he use the magic word credibility finding? Sorry. He did not use the magic word credibility finding, but he clearly credited the original testimony. I'm sorry, go ahead. Did the CEO interject the term speculative into this original discussion, or was it placed in his mouth? He answered the question, it would require speculation. And he said yes. Yes. And does that make any difference at all? I don't think so. Because there's overwhelming other evidence, including that Dames lost money on every single triple-D ductless dryer it ever built, including the one built before the Rembrandt. The Rembrandt contract was signed at the end of 2014. This was a new, highly proprietary design, so highly proprietary that when we attached the contract to the complaint, there was a counterclaim asserted against us for revealing their confidential information by attaching it to the court record. They lost money on that one, a boatload of money. They projected a 27% or 28% profit. They lost 42%. Well, their average was 9%, though. Their average. But the two others, Your Honor, Judge Benton, the two others were actually bid and contracted after the Rembrandt contract. So there were four triple-D dyers, one entered in two before, two entered in two after. They lost money in all three. The average, you're right, the average was 9% loss, but zero lost profits. Dames admitted it's significantly underbid. The change orders on the Rembrandt contract, so the Rembrandt contract was entered into November of 2014. The change orders were entered in early 2015 using the exact same methodology, the exact same costing software, costing methodology. If they underbid them, does that mean they owe you less restitution? No, it means they owe us... Think about it a second before you answer. No, no, I'll tell you exactly what it means. They overcharged us, Your Honor. So the contract on the change orders said that they could not have more than a 10% profit margin built into their change orders. We established that these change orders secretly built in a 25% profit margin. So they overcharged us. The gross purchase price was $129,000, too high. The district court refused to give Rembrandt credit for the indisputable overcharge because he said we did such an excellent job of demonstrating that their cost estimates are virtually worthless. And it's worth noting that the very document that is the 27.1% loss profit, that's a cost estimate. And that cost estimate, the judge found, was virtually worthless with respect to numerous other cost estimates. They kept shifting stories and shifting documents, but we were able to show, and the judge details at length in his findings, all of the problems with the historical evidence, all the charts they put up that contain highly misleading numbers. The judge detailed them very, very thoroughly. I don't think it helps this panel for me to walk you through all the other evidence that shows that there just was no credible evidence of lost profits. So Judge Strand says that there are no lost profits. The fact of profit has not been established with reasonable certainty. There's a trial, obviously, and he makes those findings. In making those findings, he sets forth that he's not requiring mathematical precision, but instead the standard is one of reasonable certainty. There's a motion made where they then say that, hold on, wait a minute, even though you've paid lip service to the standard, you haven't followed the standard. And he says, oh, no, I applied the standard. I said I did, and here are the findings of fact that I made. So this question all of a sudden is not really one of loss so much as it is one of what are Judge Strand's findings of fact as regards the damages, right, what was proven, right? And that's a fact question. And so what's the standard of review that we apply to those fact findings by Judge Strand? Clearly erroneous, contrary to law. And that is the issue on appeal. You have to review Judge Strand's fact findings and determine whether they're clearly erroneous. And, you know, not only... He's clearly trying to tell us that I know what the standard is, he's quoted the right standard, and he says these are the facts I've found, right? Yes, and... And then he draws a conclusion based on those facts. Yes, and in his decision denying the order for a new trial, he sets forth even more detailed facts. I mean, he says, I'm going to re-examine the record. He says, I have looked at everything again a second time, and I'm correct, and here are these additional findings. And so, yes, this is purely a review of factual findings by the district court, and I don't think that the appellant can come close to meeting its burden of demonstrating that they're clearly erroneous or contrary to law. And, in fact, my learned colleague did not really spend any time talking about Judge Strand's findings. And if you read their entire opening brief, they don't talk about the findings. Well, in response to us, she talked about the findings. That's a little bit too general, but go ahead. But that's my point, is their burden is to show that Judge Strand's findings are clearly erroneous or contrary to law, and this court's decisions show what a difficult burden that is, and I don't think they come close to meeting that burden in this case. So, since Judge Strand did not require the disgorgement of all monies paid, there's an argument to be made that dames actually prevailed, and that at a bare minimum, they ought to be awarded their costs. Why is that wrong? Well, the district court obviously has substantial discretion in determining who is the prevailing party. The real fight here, Your Honours, was over lost profits. We didn't dispute that they were entitled to the $900,000 in costs. There was one that, to be perfectly candid, they had baked into their number $15,000 or some amount in legal fees that we objected to. But that was the only amount that we objected to. The entire fight at trial was on the lost profits and that they had another $385,000. And we prevailed on the two most significant issues in the case. So the judge was well within his discretion in concluding that both parties could be determined as prevailing. Unless the panel has any further questions, we request that the panel affirm the decision below. Thank you, and thank you, counsel, for the argument. Case number 18-1808 is submitted for decision by the court. Counsel, that was within your 15 minutes. The yellow light came on. That was included. No, that's okay.